**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**OZANNE CONSTRUCTION COMPANY, Respondent.**

No. 95–6058.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 10, 1996.

Decided Feb. 24, 1997.*

---

* This decision was originally issued as an "unpublished decision" filed on February 24, 1997. On March 27, 1997, the court designated the opinion as one recommended for full-text publication.

Nancy B. Hunt (briefed), National Labor Relations Board, Office of the General Counsel, Washington, Aileen A. Armstrong, Deputy Asso. Gen. Counsel, Paul J. Spielberg, John Burgoyne (argued), National Labor Relations Board, Appellate Court Branch, Washington, DC, for Petitioner.

Martin S. List (argued and briefed), Duvin, Cahn & Hutton, Cleveland, OH, for Respondent.

Before BOGGS, NORRIS, and GIBSON,\*\* Circuit Judges.

BOGGS, Circuit Judge.

In this unfair labor practices case, the National Labor Relations Board ("the Board") applies to this court for a decree enforcing its Order of May 12, 1995 against Ozanne Construction Company ("Ozanne" or "the company"). We grant the Board's application.

I

In 1986, pursuant to a consent agreement in an unfair labor practices dispute, the Cole-Jon Mechanical Corporation recognized Local 47 of the Service Employees International Union ("Local 47") and Teamsters Local 416, an affiliate of the International Brotherhood of Teamsters ("Local 416"), as joint collective bargaining representatives in a single unit of custodial and maintenance employees at NASA Lewis Research Center ("LRC") in Cleveland. ColeJon and the two locals negotiated successive collective bargaining agreements, including one in 1991, which under its terms would expire in 1994. Under these agreements, the two locals functioned separately for the purposes of grievance representation and union membership. Local 47 represented about 80 ColeJon employees, and Local 416 represented about 150.

In the spring of 1992, Ozanne bid for and obtained part of the custodial and maintenance contract at LRC. Other bidders obtained other parts of ColeJon's business with LRC. ColeJon's departure meant that as of September 1, 1992, the date Ozanne was slated to start operations, there would no longer be a collective bargaining agreement in place for workers performing the functions at LRC taken over by Ozanne. *See NLRB v. Burns Int'l Sec. Servs., Inc.,* 406 U.S. 272, 290, 92 S.Ct. 1571, 1583–84, 32 L.Ed.2d 61 (1972) (employer not bound by collective bar-

\*\* The Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting by designation.

gaining agreement executed by predecessor). To avoid that situation, in August 1992, Local 47's president, Michael P. Murphy, and Local 416's president, Nicholas Nardi, signed and delivered to Ozanne copies of a contract virtually identical to the one with ColeJon. They also signed and delivered a separate, one-page "Assumption Agreement" pledging Ozanne to retain all ColeJon employees by seniority to the extent necessary, and to recognize their rights to benefits accrued through seniority. On September 1, Local 47 demanded recognition as representative of its members who worked at Ozanne. Ozanne promptly granted that request (making no mention of the joint representation) but stoutly denied that it was a successor or continuing employer of ColeJon. However, Ozanne appears to have later acknowledged its obligation to recognize the joint representative because more than half of the workers it hired were members of the pre-existing joint collective bargaining unit.

The portion of ColeJon's contract at LRC taken over by Ozanne involved few Teamsters jobs. By the time Ozanne began operations at LRC, the company had hired ten members of Local 416. The rest of Local 416's members who had worked for ColeJon at LRC—some 140 workers—were hired by the other contractors who succeeded ColeJon at LRC. By contrast, all the eighty-odd ColeJon jobs represented in the past by Local 47 fell within the ambit of Ozanne's operations. Ozanne hired only fifty-one Local 47 members who had worked for ColeJon. It also hired twenty-nine new (and therefore non-senior) employees. Fresh hiring, of course, ran counter to the aims of Local 47 as embodied in the proposed assumption agreement.

Over the next nine or ten months, Ozanne and Local 47 met a number of times to discuss Local 47's demand that Ozanne hire, in order of seniority and as needed, the Local 47 members who had worked for ColeJon. Local 47 mounted a campaign to pressure Ozanne to comply. This campaign included picketing, distribution of flyers, and correspondence with officials including Congressman Louis Stokes. Ozanne alleges that some of these efforts were designed to strip Ozanne of its status as a minority set-aside contractor and thereby to cause it to lose the LRC contract. Local 416 supported the pressure campaign to some degree, but without the intensity that self-interest lent to Local 47's exertions.

During this period, Ozanne's custodial and maintenance employees at LRC worked without a contract. In late spring of 1993, Local 416's Nardi contacted the president of Ozanne. Nardi testified that he "told him that I want[ed] to bargain with him, and severed myself from Local 47, because Michael [Murphy] didn't want to deal—Michael didn't want to bargain." At about the same time, Nardi told Murphy, in essence, that Local 416 wanted a contract in place and intended to go it alone. Murphy, without protest, asked Nardi to provide him with a copy of whatever contract he concluded with Ozanne. Nardi subsequently sent him a copy of an executed contract between Ozanne and Local 416, covering its ten employees. Ozanne at no time notified Local 47 that it intended to deal separately with Local 416.

In July 1993, Local 47 requested information from Ozanne concerning the combined bargaining unit. It reminded Ozanne that it shared representative status with Local 416, and that Ozanne was obliged to bargain jointly with the two unions. In response to a second request for information, Ozanne declared that "there [was] no longer a viable appropriate bargaining unit which SEIU, Local 47 and Teamsters Local 416 might 'jointly' represent," and that therefore Ozanne was "under no obligation to provide the information requested...."

Local 47 filed charges with the NLRB, alleging that by withdrawing recognition of Local 47 as a joint exclusive collective bargaining representative and modifying the established bargaining unit by separately negotiating a contract with Local 416, Ozanne violated § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1). Local 47 also charged that by refusing to furnish the requested information, Ozanne violated § 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5). The General Counsel of the NLRB subsequently issued a complaint against Ozanne, based on those charges. After a hearing, an administrative law judge

held that Ozanne had violated the Act as alleged.

The ALJ reached that conclusion primarily on the authority of *California Nevada Golden Tours,* 283 NLRB 58, 1987 WL 89545 (1987), a decision it found to be "virtually on all fours with the instant case." In that case, two Teamsters locals (Locals 533 and 265) were certified as the joint collective bargaining representative for bus drivers employed by Grey Line Scenic Tours. Following some ill feelings between the two locals over allocation of "bid runs," and unilateral overtures from both locals, Grey Line negotiated a contract with Local 265 containing terms distasteful to Local 533, which filed a complaint with the Board. Grey Line argued that "parties to a joint certification ... may voluntarily adopt a different mode of negotiations and that Local 533 had temporarily waived the right to bargain on a joint basis by its conduct which had induced [Grey Line] reasonably to believe that both Local 533 and Local 265 desired separate negotiations." *Id.* at *14. The ALJ, whose decision and recommended order were adopted by the Board, rejected that defense, finding that Grey Line "violated Section 8(a)(5), (2) and (1) of the Act by recognizing Local 265 as the collective bargaining representative of a portion of the appropriate bargaining unit, negotiating separately with Local 265, and entering into, and implementing, the terms of the resulting separate collective-bargaining agreement with Local 265." *Ibid.*

Here, the ALJ similarly found that nothing in Local 47's conduct waived its right to bargain as part of the joint unit, and that Local 47 had, in fact, continuously asserted that right. The ALJ also found that Ozanne's entry into a contract with Local 416 alone violated the Act, just as Grey Line's bipartite contract with Local 265 did. The ALJ recommended that Ozanne be ordered to cease and desist from (a) failing to recognize Local 47 and Local 416 as the joint exclusive bargaining unit; (b) recognizing Local 416 as the exclusive bargaining representative of a portion of the maintenance workers at LRC; (c) giving effect to the contract between Ozanne and Local 416; and (d) refusing to furnish Local 47 requested

information to which it was entitled. The ALJ recommended that Ozanne be affirmatively ordered to (a) withdraw recognition of Local 416 as exclusive collective bargaining representative; (b) recognize and bargain in good faith with Local 47 and Local 416 as the exclusive joint bargaining representative; (c) provide requested information to Local 47; and (d) post at its facilities a notice to employees that the company had been found to violate the Act, that the employees had certain rights under § 7 of the Act, and the company would comply with the orders of the Board.

Ozanne filed exceptions, to which the Board's General Counsel replied. The Board unanimously affirmed the ALJ's rulings, findings, and recommendations, and adopted the recommended Order. *See Ozanne Constr. Co.,* 317 NLRB 396, 1995 WL 295601 (1995). The application before us followed.

## II

■■■ The Board's fact-finding must be upheld if supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). In addition, the Board's construction of the National Labor Relations Act will be accepted if "reasonably defensible," because the Board is charged with enforcing the Act. The Board's application of the law to particular facts is reviewed under the substantial evidence standard. *Nestle Ice Cream Co. v. NLRB,* 46 F.3d 578, 581 (6th Cir.1995).

Ozanne asserts that the Board erred in finding that the Company was obligated to bargain jointly with Local 47 and Local 416, and makes several arguments to support its view.

### 1. *The Impasse Theory.*

Ozanne submits that the entire course of Local 47's behavior—the presentation of the assumption agreement, the insistent declarations by Murphy in meetings with Ozanne, and elements of the local's pressure campaign—demonstrates that the union illegally treated the issue of hiring former ColeJon

employees as a precondition to a contract;[1] that Local 47's insistence caused an impasse on that issue, a permissive rather than mandatory subject of bargaining;[2] and that Ozanne, under precedents of the Board and the courts, was therefore relieved of its duty to bargain with Local 47.

For authority that such conduct by a union could suspend a company's duty to bargain, *Ozanne* submits *Chicago Tribune Co.*, 304 NLRB 259, 1991 WL 167123 (1991), and several other cases.[3] In *Chicago Tribune Co.*, the employer offered as an affirmative defense to charges of unfair labor practices the claim that the union unlawfully insisted to impasse on the permissive subject of including supervisors in the bargaining unit. The Board noted that it "has held that in certain circumstances a union's insistence to impasse on bargaining demands about permissive bargaining subjects suspends an employer's statutory bargaining obligation...." *Id.* at *3. Without deciding whether the facts showed that the union had insisted to impasse, or if it had, whether that was sufficient to suspend the company's duty to bargain, the Board in *Chicago Tribune Co.* remanded to the ALJ to make further findings and conclusions with respect to that defense.

■ Here, the General Counsel acknowledges the principle that insistence to impasse can under some circumstances suspend the duty to bargain. However, it asserts that the principle, as shown by the cases cited by Ozanne, merely allows a company unilaterally to implement its last, best offer, but does not allow an employer to withdraw recognition from its employees' representative.

Having reviewed these cases, we agree with the General Counsel. For example, in *Shell Oil Co.*, the union demanded that Shell bargain with all nineteen of its locals together, rather than with each one separately. The court held that Shell's refusal to bargain as requested on this permissive subject was not an unfair labor practice. However, Shell never moved to deny recognition of the individual locals, undercutting Ozanne's reliance on this case for the principle it seeks to demonstrate. *Shell Oil Co.*, 194 NLRB 988, 1972 WL 24733 (1972), *aff'd sub nom. Oil, Chem. and Atomic Workers Int'l Union v. NLRB*, 486 F.2d 1266 (D.C.Cir.1973).

In *Inland Tugs*, a union negotiating with the employer insisted that no agreement could be reached unless the company accepted a fleet-wide bargaining unit and continued to contribute to the union trust fund. Under these circumstances, the company's duty to bargain was suspended, and it was entitled to implement unilateral changes. However, the court explicitly held that "an employer [could not] circumvent entirely its employees' chosen representative solely because of that representative's intransigence at the bargaining

1. As evidence that Local 47 made the hiring of the former workers a precondition to a new contract, Ozanne quotes from a leaflet distributed by Local 47 to the public: "FACT: The Union and the Employer have agreed on the terms of a collective bargaining agreement. The sole issue is returning the displaced workers back to work!!" Resp. Br. at 10; see JA at 137.

Ozanne similarly excerpts a passage from Murphy's letter to Congressman Stokes: "... we would be willing to meet and resolve these matters provided the company is willing to employ the workers in order of seniority."

2. *Oil, Chemical and Atomic Workers International Union v. NLRB*, 486 F.2d 1266, 1268 (D.C.Cir. 1973) supplies a brief explanation of the distinction between mandatory and permissive subjects of bargaining: "The Board, supported by the courts, has held that any subject of negotiations that falls within the definition of 'collective bargaining' is a 'mandatory' subject that either party can raise and insist that the other party agree to as a condition to reaching agreement. Any other subject, if not illegal, is a 'voluntary' subject that may be discussed, but that neither party may demand as a condition to an agreement."

"Collective bargaining," in turn, is defined by the Act as "the performance of the mutual obligation of the employer and the representative of the employees to met at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment...." 29 U.S.C. § 158(d).

The hiring of former employees in order of seniority does not fall within this definition, so is a voluntary or permissive subject of bargaining.

3. *Shell Oil Co.*, 194 NLRB 988 (1972), *aff'd sub nom. Oil, Chem. and Atomic Workers Int'l Union v. NLRB*, 486 F.2d 1266 (D.C.Cir.1973); *Young & Hay Transp. Co.*, 214 NLRB 252 (1974); *Midwestern Instruments, Inc.*, 133 NLRB 1132 (1961); *Double S Mining, Inc.*, 309 NLRB 1058 (1992); and *Inland Tugs v. NLRB*, 918 F.2d 1299 (7th Cir.1990).

table. In none of the cases cited by [the employer] has a court or the N.L.R.B. so held, and we decline to do so here." *Inland Tugs v. NLRB*, 918 F.2d 1299, 1311 (7th Cir.1990).

In summary, assuming that Local 47 negotiated to impasse on an impermissible subject,[4] Ozanne could have unilaterally implemented its last, best offer, and, as the ALJ pointed out, filed its own charges of unfair labor practices against Local 47. Negotiation to impasse, however, did not entitle Ozanne to terminate recognition of the established bargaining unit. *See Boise Cascade Corp. v. NLRB*, 860 F.2d 471, 475 (D.C.Cir. 1988) ("neither an employer nor a union has the unilateral power to modify the scope of the bargaining unit as determined by the Board, whether following bargaining to impasse or otherwise").

2. *The Rift Theory.*

■ Ozanne argues that Local 47 sought to compel it to negotiate with Local 47 separately, in violation of board holdings that an employer is entitled to bargain jointly with the entities comprising a joint bargaining representative. *See Gene Fiedler Chevrolet Co.*, 245 NLRB 1075 (1979), 1979 WL 10039, *3 n. 3 (1979) (where automobile body repairmen's union and automobile painters' union desired to establish joint representation at car dealership, employer's opposition on grounds that the two unions in reality would represent only their respective employees was without merit because employer could insist that the joint representative bargain jointly in fact for the employees as a single unit). Even assuming that Local 47 did attempt to compel separate negotiation,

Ozanne still does not explain how that would constitute a defense against the company's own charged violations. But the ALJ found that it was not Local 47 that sought separate negotiations; instead, "all of the impetus for separate negotiations originated with Local 416 and Respondent." Moreover, the ALJ deemed it reasonable for Local 47's chief area of interest to be the issue of hiring former employees in order of seniority, because most terms and conditions were already settled by the Service Contract Act, and because it was Local 47's members who were not hired "[i]t [stood] to reason that Local 47 would bear the principal burden of advancing their cause." Furthermore, the issue of hiring former employees in order of seniority was most important to Local 47 under the immediate circumstances, but could well have been of value to Local 416 in the future. For these reasons, Local 47's emphasis on the issue of rehiring former employees was not an attempt to compel Ozanne to deal separately.

■ A related argument by Ozanne is that (in its words) "an irreconcilable rift had developed between Local 47 and Local 416 such that they were unable, and unwilling, to bargain jointly. They had no common agenda to present to the Company. The joint representative had, for all practical purposes, thus ceased to exist." And: "Local 47 frustrated the bargaining process, destroying the joint representative status it had agreed to accept. It cannot now ask the [ALJ] and the Board to reconstruct what it voluntarily chose to take apart." Ozanne cites no cases to support this theory of labor law; the General Counsel offers several cases to show that the

---

4. The ALJ, however, rejected Ozanne's assertion that Local 47 insisted to impasse. The ALJ found that Local 47 did not treat hiring of the former workers as a precondition. After all, Local 47, together with Local 416, submitted to Ozanne a signed contract that made no reference to the issue of former workers. The contract was not dependent on or conditioned upon acceptance of the assumption agreement submitted to Ozanne at the same time. Ozanne neither signed this contract nor submitted counterproposals. Ozanne's claim that Local 47 preconditioned bargaining depends in part on testimony by Nardi of Local 416. To the extent that this conflicted with Murphy's testimony, the ALJ found Mur-

phy more credible. In sum, the ALJ found that Local 47 had not stalled negotiations with its demand. Instead, the ball had been in Ozanne's court all along.

The Board "considered the documentary evidence referred to by Respondent in its brief and [found] it does not warrant reversing the judge's finding that Local 47 did not negotiate to impasse on a nonmandatory subject...." Having taken due note of the insistent aspects of Local 47's conduct, we nonetheless conclude that there was substantial evidence to support the Board's finding, and the Board's finding is therefore conclusive.

Board's "schism" doctrine does not fit these facts. *See Clayton & Lambert Mfg. Co.*, 128 NLRB 209, 210 (1960); *Southwestern Portland Cement Co.*, 126 NLRB 931, 934 (1960); *B & B Beer Distrib. Co.*, 124 NLRB 1420, 1422 (1960); *Hershey Chocolate Corp.*, 121 NLRB 901, 908–09 (1958).

To support its view of the facts, Ozanne submits Nardi's testimony regarding a chance conversation between him and Murphy which, Ozanne says, demonstrated the existence of a rift. It also argues that Murphy conceded the existence of the rift by not objecting, and even saying that he understood, when Nardi told him Local 416 was going to deal separately with Ozanne.

The ALJ found that there "may have been frustrations for all the parties" but there was no "irreconcilable rift." We cannot say that substantial evidence did not support the ALJ in this determination. Murphy's mild reaction to Nardi's statement of intent to go it alone does not suggest the bitterness one might expect to accompany a total schism. It seems more likely that Local 416's separate dealing with Ozanne created a rift than that it resulted from one. In any event, relying on *California Nevada Golden Tours*, the ALJ found that the fact that Local 416 had its own agenda did not provide either Local 416 or Ozanne "with license to abrogate the bargaining relationship, modify the historic recognized unit and bargain separately."

*3. The Waiver Theory.* Ozanne argues that Local 47 waived its right to represent the Ozanne employees by concentrating exclusively on the concerns of former employees, not present ones. The ALJ easily and correctly disposed of this argument with the principle that "a waiver of statutory right must be clearly and unmistakably established and is not lightly to be inferred." Far from stating its desire to waive its right of representation, the ALJ found, "every overt manifestation of intent on the part of Local 47 was to affirm and maintain its joint representative status."

■ *4. The Bad Faith Theory.* Ozanne characterizes Local 47's leaflets, letters to public officials, and picketing signs, and—especially—its alleged attempt to cause Ozanne to lose its status as a minority set-aside contractor, as "so vicious, in such bad faith, and so patently destructive to the interests of both [parties] that they permitted and compelled the Company to terminate any bargaining obligation it may otherwise have owed to Local 47." To support its view that Local 47's actions were so inimical to Ozanne's interests as to extinguish the duty to bargain, Ozanne offers a policy argument that "federal labor policy, while certainly permitting controversy and tough economic actions of the parties, surely does not permit a party to seek the very destruction of the other...." Ozanne's only authority, offered without explanation, is *Kaiser Foundation Hospitals*, 258 NLRB 29, 1981 WL 20774, *supplanted by* 259 NLRB 393, 1981 WL 21025 (1981). The relevance of this case, frankly, is obscure to us. Even if Ozanne could cite clear authority to support its theory, Local 47's pressure campaign, stubborn and combative though it may have been, did not earn a place in the annals of labor strife as particularly "vicious" conduct. The record contains copies of union flyers, photographs of picket signs, and letters to public officials. The saltiest of these items isn't very: in mildly flavorful language, it charges Ozanne with a lack of compassion for workers, discrimination against women and minorities, and hiring of friends and relatives of Ozanne's managers rather than the former Local 47 employees. We notice no profanity, no obviously defamatory statements, no threats in any of this material. The strongest epithet used against the employer, "Hurricane Ozanne," (which "sweeps through NASA leaving union workers jobless"), is but a fresh breeze on the Beaufort scale of invective. Even if there were a valid legal theory on which Ozanne relied, the facts do not support a finding that Local 47 campaigned for Ozanne's "very destruction."

### III

■ Ozanne further argues that the remedy in the Board's order is inappropriate and overly broad. Ozanne seeks to avoid having to post a notice stating that the Board has ordered it not to "interfere with, restrain, or coerce our employees in the exercise of their

Section 7 rights." It asserts that "[t]here are absolutely no allegations of any actions or malice or any actions or intentions on the part or the Company to interfere with employee rights other than in [the subtle legal context of joint representation and the substance of this litigation]. There is thus no need to give readers of the Notice the impression that the Company did interfere with or restrain employees in the exercise of their rights other than in the context of a complicated issue of bargaining obligations." Ozanne therefore asks that, if the Board's application is granted, item 1(e) should be deleted from the Order, and the corresponding passage removed from the required notice.

The General Counsel counters that it has "broad discretion" to devise remedies for unfair labor practices, "subject only to limited judicial review," citing *Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 898–99, 104 S.Ct. 2803, 2812–13, 81 L.Ed.2d 732 (1984) (Court has repeatedly interpreted Section 10(c) of the act as vesting in the Board the primary responsibility and broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial review). The General Counsel further notes that the contested language of the order and notice is accurate and appropriate, and already narrower than authorized by law: the Board could have ordered Ozanne to cease and desist from its unlawful conduct and *in any other manner* interfering with employee rights. We find nothing egregious in the Board's remedy to cause us to stray from the narrow scope of review as described by the Supreme Court in *Sure–Tan.*

IV

Having found that the factual findings of the Board and the application of the law to the facts were supported by substantial evidence on the record considered as a whole, we GRANT the application of the Board for enforcement of its order.