**TOLEDO AREA AFL–CIO COUNCIL, et al., Plaintiffs–Appellees,**

v.

**Anthony G. PIZZA, et al., Defendants,**

**Bob Taft and The Ohio Elections Commission, Defendants– Appellants.**

No. 97–3298.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 6, 1998.

Decided Aug. 19, 1998.

Andrew Nickelhoff (argued and briefed), Eileen Nowikowski, Sachs, Waldman, O'Hare, Bogas & McIntosh, Detroit, Michigan; Stewart R. Jaffy, Stewart Jaffy & Associates, Columbus, Ohio, for Toledo Area AFL–CIO Council.

Andrew Nickelhoff (argued and briefed), Eileen Nowikowski, Sachs, Waldman, O'Hare, Bogas & McIntosh, Detroit, Michigan; Stewart R. Jaffy, Stewart Jaffy & Associates, Columbus, Ohio; Jennifer L. Brunner, Brunner & Brunner, Columbus, Ohio, for Ohio State AFL–CIO, American Federation of State County and Municipal Employees, Seafarer's International Union of North America and William A. Burga.

Andrew Nickelhoff (argued and briefed), Sachs, Waldman, O'Hare, Bogas & McIntosh, Detroit, Michigan; Stewart R. Jaffy, Stewart Jaffy & Associates, Columbus, Ohio; Jennifer L. Brunner, Brunner & Brunner, Columbus, Ohio, for Dal Lawrence.

David M. Gormley (briefed), Office of the Attorney General of Ohio, Columbus, Ohio; Jeffrey S. Sutton (argued and briefed), State Solicitor, Columbus, Ohio, for Anthony Pizza, Bob Taft and Ohio Elections Commission.

Christine A. Reardon (briefed), Kalniz, Iorio & Feldstein, Toledo, Ohio; Donald J. McTigue (briefed), McTigue & Brooks, Columbus, Ohio, for Ohio Education Association and United Automobile Workers of America Regions 2 and 2B.

Before: MERRITT, KENNEDY, and BOGGS, Circuit Judges.

BOGGS, J., delivered the opinion of the court, in which KENNEDY, J., joined. MERRITT, J. (pp. 327–28), delivered a separate dissenting opinion.

**1.** The plaintiffs in this case are: the Toledo Area AFL–CIO Council; the Ohio State AFL–CIO; the American Federation of State, County and Municipal Employees ("AFSCME"); the Seafarers International Union of North America; William Burga, the president of the Ohio State AFL–CIO; and Dal Lawrence, president of the Toledo Area AFL–CIO Council.

**2.** Section 3517.09(C) specifically covers solicitations for contributions to "a candidate, campaign

**OPINION**

BOGGS, Circuit Judge.

Several labor unions and union officials [1] brought a facial challenge to various portions of Ohio's Campaign Finance Reform Act shortly before it was to take effect on August 23, 1995. The United States District Court for the Northern District of Ohio preliminarily enjoined many of the challenged provisions of the Act. The district court later converted this preliminary injunction into a permanent injunction, finding several provisions of the Act unconstitutional. The State of Ohio filed a timely appeal challenging the district court's ruling as to four subsections of the Act:

(1) O.R.C. § 3517.09(C), requiring that whenever corporations and unions solicit employees and members for contributions to political causes [2], they inform them that no reprisal or benefit will result from their response to such solicitation;

(2) O.R.C. § 3517.082(D), imposing a four times-a-year limit on corporate and union solicitations of employees and members for donations to their political action committees ("PACs"), requiring anyone soliciting employees or union members for donations for such PACs to give the disclaimer required by § 3517.09(C), and requiring all such solicitations to be in writing;

(3) O.R.C. § 3599.031(H) banning public employers from administering automatic payroll deductions ("checkoffs") for political purposes; and

(4) O.R.C. § 3599.031(I) applying the wage checkoff ban to supersede clauses in pre-existing collective bargaining agreements granting public employees the right to checkoffs for certain political causes.

committee, political action committee, legislative campaign fund, or political party...." Section 3599.031(H) extends to checkoffs for "any candidate, separate segregated fund, political action committee, legislative campaign fund, political party, or ballot issue." When discussing sections 3517.09(C) and 3599.031(H) we will use the phrase "political causes" as a shorthand for all of the political entities covered by these provisions.

On appeal, the State of Ohio contends that these four provisions do not violate the plaintiffs' rights under the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, or the Contracts Clause of Article I, Section 10 of the United States Constitution and, therefore, should not be enjoined. We agree with the State's argument that O.R.C. § 3599.031(H) does not violate the constitutional rights of the plaintiffs-appellees.[3] However, we affirm the district court's ruling that O.R.C. §§ 3517.082(D) and 3517.09(C) are unconstitutional, and we hold that subsection (I) of O.R.C. § 3599.031 violates the Contracts Clause and cannot be enforced to abrogate the terms of pre-existing collective bargaining agreements granting public employees the right to make political contributions through checkoffs.

I

All three of the provisions at issue in this case relate to political contributions by corporate employees and labor union members and the solicitation of such contributions. Ohio Revised Code section 3517.09(C) states:

An employer or labor organization that, directly or through another person, solicits an employee of the employer or a member of the labor organization for a contribution to a candidate, campaign committee, political action committee, legislative campaign fund, or political party shall inform the employee or member at the time of the solicitation that making a contribution is voluntary and that a decision of the employee or member to make a contribution or not to make a contribution will not benefit the employee or member or place the employee or member at a disadvantage with respect to his employment by the employer or his membership in the labor organization.

Ohio Revised Code section 3517.082(D) provides:

Solicitations of contributions pursuant to division (B)[4] of this section from employees of a corporation or members and employees of a labor organization other than executive and administrative employees of a corporation or officers and executive and administrative employees of a labor organization shall be in writing and shall not be made more than four times during each calender year. Any person who solicits any employee of a corporation or member or employee of a labor organization for a contribution to a political action committee established or administered by the corporation or labor organization under division (A)(1) of this section shall inform the employee or member at the time of the solicitation that he may refuse to make a contribution without suffering any reprisal.

Ohio Revised Code sections 3599.031.(H) & (I) provide:

(H) No public employer shall deduct from the wages and salaries of its employees any amounts for the support of any candidate, separate segregated fund, political action committee, legislative campaign fund, political party, or ballot issue.

---

3. We are aware of the Ohio Court of Appeals decision in *United Auto Workers Local Union 1112 v. Philomena*, 1998 WL 110634 (Ohio App., 1998) (unpublished) (holding O.R.C. §§ 3517.09(C), 3517.082(D), and 3599.031(H) and other portions of the Ohio Campaign Finance Reform Act unconstitutional), *appeal not allowed*, 81 Ohio St.3d 1508, 692 N.E.2d 615 (Ohio, July 1, 1998). In reaching its conclusion that O.R.C. § 3599.031(H) was unconstitutional, the Ohio Court relied exclusively on federal case law. We disagree with our Ohio counterparts' interpretation of this case law. However, as an intermediate federal appellate court, our judgment cannot directly overrule that of our Ohio counterparts. Since the Ohio Supreme Court has refused to hear the appeal in *Philomena*, it is up to the United States Supreme Court to resolve the difference of opinion as to the facial constitu-

tionality of O.R.C. § 3599.031(H) resulting from our opinion and *Philomena*.

4. Subsection B of O.R.C. § 3517.082 provides:

(B)(1) A corporation and a nonprofit corporation may solicit contributions from its stockholders, officers, directors, trustees that are not corporations or labor organizations, and employees.
(2) A nonprofit corporation also may solicit contributions from:
 (a) Its members that are not corporations or labor organizations;
 (b) Officers, directors, trustees that are not corporations or labor organizations, and employees of any members of the nonprofit corporation.
(3) A labor organization may solicit contributions from its members, officers, and employees.

(I) In addition to the laws listed in division (A) of section 4117.10 of the Revised Code that prevail over conflicting agreements between employee organizations and public employers, this section prevails over any conflicting provisions of agreements between labor organizations and public employers entered into pursuant to Chapter 4117 of the Revised Code.

## II

■ The legislation challenged in this case purports to be the result of efforts by Ohio legislators to respond to public outcry for "campaign finance reform."[5] *See United Auto Workers Local 1112 v. Philomena*, 1998 WL 110634 at *3–4 (Ohio App. 1998), *appeal not allowed by* 81 Ohio St.3d 1508 (July 1, 1998); Lee Leonard, *Voinovich OKs Finance Reform Plan; Those Who Wanted Stricter Measures Give Approval*, COLUMBUS DISPATCH, May 25, 1995, at 6C. The popularity of the challenged measures does not, however, affect this court's analysis of their constitutionality. No matter how popular these efforts are, we must examine them for conformity with the Constitution to insure that the rights there preserved are not sacrificed for "an expedient solution to the crisis of the day." *New York v. United States*, 505 U.S. 144, 187, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). We must be especially vigilant when, as in this case, the challenged laws implicate "an area of the most fundamental First Amendment activities"—discourse about the merits of political candidates and public issues. *Buckley v. Valeo*, 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Our nation has a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). This is because, as Justice Holmes so eloquently explained, "the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market...." *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting). With these principles in mind, we turn to examine the provisions at issue in this appeal.

## III

A. Section 3517.09(C) is Unconstitutional

■ Section 3517.09(C) regulates solicitations of political contributions by corporations and unions from employees and union members. It requires that union and corporate solicitors inform employees of corporations and members of unions, at the time of a solicitation for a political cause, that their decision to contribute or not to contribute will neither benefit nor disadvantage them with respect to their union membership or employment with the corporation. This statement is required whether the solicitation is made directly or indirectly through another person. The district court held that this provision impermissibly impinged on the political free speech rights of those subject to it. We agree.

The State of Ohio characterizes section 3517.09(C) as a permissible regulation intended to foster the state's interest in ensuring that political contributions by corporate employees and labor union members are vol-

---

**5.** Contrary to Judge Merritt's dissent, I do not think that the "campaign finance reform movement" requires the courts "be especially vigilant" because it is a "public outcry" (not a pejorative phrase, in my understanding). Rather, I simply agree with the Supreme Court that although "political speech by its nature will sometimes have unpalatable consequences ... our society accords greater weight to the value of free speech than to the dangers of its misuse." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357, 115 S.Ct. 1511, 131 L.Ed.2d 426, (1995), *citing Abrams v. United States*, 250 U.S. 616, 630–31, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting).

Some may believe, with Walt Whitman, that "[t]he eager ... appeals of reformers ... are indispensable to counterbalance the inertness and fossilism making so large a part of human institutions." Walt Whitman, *Democratic Vistas*, *reprinted in* WALT WHITMAN, COMPLETE POETRY & COLLECTED PROSE 950 (Library of America 3d ed.1982). Others may agree with Senator Roscoe Conkling that "[w]hen Dr. Johnson defined patriotism as the last refuge of a scoundrel, he was unconscious of the then undeveloped capabilities and uses of the word reform." DAVID M. JORDAN, ROSCOE CONKLING OF NEW YORK 279 (1971). In either case, the wisdom of reform is not our concern. The Constitution is.

untary. Ohio analogizes this prophylactic measure to 2 U.S.C. § 441b(b)(3)(C) [6]. The state also argues that it is a measure necessary to effectuate the right of workers to refuse to contribute to political causes with which they disagree, as recognized in *Abood v. Detroit Board of Education*, 431 U.S. 209, 236, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977).

■ We cannot agree with the state's characterization of section 3517.09(C). A law mandating speech "that a speaker would not otherwise make necessarily alters the content of the speech" and is a "content-based regulation" subject to strict scrutiny. *Riley v. National Fed. of the Blind of North Carolina*, 487 U.S. 781, 795, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). To survive, section 3517.09(C) must be necessary to serve a compelling state interest and must be narrowly tailored to achieve that end. *Id.* at 798, 108 S.Ct. 2667. The state's argument that less exacting scrutiny should be applied is not supported by our recent decision in *Michigan State AFL–CIO v. Miller*, 103 F.3d 1240 (6th Cir.1997).

*Miller* involved a challenge to a statute requiring for-profit and not-for-profit corporations and labor unions to obtain affirmative consent once a year from employees and members making political contributions through checkoffs.[7] *Id.* at 1243. The statute was not subjected to strict scrutiny because the justification for the statute was not based on the content of the speech and "the statute ma[de] no explicit reference to any particular speech and treat[ed] all speakers evenhandedly." *Id.* at 1252. Additionally, although the statute in *Miller* was "confined to political speech, there [was] no basis for concern that the state [wa]s trying to suppress that speech." *Ibid.* There was "[n]othing in the statute evinc[ing] a hostility to political speech whether in the form of contributions or solicitations." *Ibid.*

This is not so in the present case. Section 3517.09(C) burdens speech soliciting political contributions by compelling speech at the moment the contribution is sought. It imposes this burden because of the nature of the speech. It clearly evinces hostility to political speech in the form of solicitations. The statute in *Miller* permitted unfettered solicitation. It only required that after an employee or union member consented to a solicitation and agreed to contribute to a political fund through checkoffs, the corporation or union was required to obtain the contributor's affirmative consent once a year to continue the automatic deductions. The statute in *Miller* adhered to the Supreme Court's admonition that "[r]egulation of solicitation 'must be undertaken with due regard for the reality that a solicitation is characteristically intertwined with informative and perhaps persuasive speech ..., and for the reality that without solicitation the flow of such information and advocacy would likely cease.'" *Riley*, 487 U.S. at 796, 108 S.Ct. 2667. Section 3517.09(C) does not.

It is not only clear that section 3517.09(C) is subject to strict scrutiny, but also that it cannot survive that exacting standard of review. The state argues that section 3517.09(C) is necessary to effectuate the holding in *Abood v. Detroit Board of Education*, 431 U.S. 209, 236, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). *Abood* held that unions may compel workers to pay a proportionate share for collective bargaining activities from which they benefit, but that they may not compel workers to subsidize an ideological agenda with which they do not agree and that are unrelated to the union's duty as

---

6. This provision of the Federal Election Campaign Act makes it illegal for any person soliciting an employee for a contribution to a political fund "to fail to inform such employee, at the time of such solicitation, of his right to refuse to contribute without any reprisal." 2 U.S.C. § 441b(b)(3)(C). There are no cases discussing the constitutionality of this warning requirement.

7. The challenged statute provided:
 A corporation organized on a for profit or nonprofit basis, a joint stock company, a domestic dependant sovereign, or a labor organization may solicit or obtain contributions for a separate segregated fund established under this section from an individual described in subsection (2), (3), (4), or (5) on an automatic basis, including, but not limited to a payroll deduction plan, only if the individual who is contributing to the fund affirmatively consents to the contribution at least once in every calendar year.
 *Miller*, 103 F.3d at 1248–49.

collective-bargaining representative. Ohio is going beyond *Abood*. It is requiring that unions and corporations not only refrain from compelling members and workers to contribute to political causes with which they do not agree, but that they also inform members and workers that they will not be harmed or rewarded for their response to solicitations for political contributions, which they are not required to make.

We recognize that a state has a compelling interest in insuring that corporate employees and union members are not coerced to contribute to political causes they do not support. In *Abood*, the Supreme Court viewed the right to refrain from making such contributions as the necessary complement to the fundamental First Amendment right recognized in *Buckley* to contribute to political causes one does support. *Id.* at 234–35, 96 S.Ct. 612. And the Court made clear that both of these components of an individual's freedom "to believe as he will" are entitled to the utmost protection under the First Amendment. *Ibid.* We also believe that a state has a compelling interest in insuring that corporate employees and union members are aware of their right to refrain from contributing to political causes they do not support, but it can do so without burdening every act of solicitation with compelled speech. We cannot allow this interest to be vindicated, as it would be in this case, at the expense of the fundamental First Amendment right of other individuals to engage in core political speech often associated with solicitation. The Supreme Court has cautioned that "broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (internal citations omitted).

The Ohio disclaimer provision does not precisely limit its regulation to avoid trammeling First Amendment rights. By requiring corporate and union solicitors to provide a disclaimer during *every* solicitation of a

corporate employee or union member, the provision furthers the state's interest in informing workers and union members of their right to refuse solicitations for political causes, but it also undermines the effectiveness of the accompanying political speech. The brigading of solicitation with political speech has a long and honorable history. The Declaration of Independence concludes with the signers pledging without limit, "our lives, our *fortunes*, and our sacred honor." (Emphasis added). Under Ohio law, a union leader could not address a meeting of workers, read the Declaration, and say, "And we should pledge our fortunes, too, by contributing," without adding the disclaimer. William Jennings Bryan could not have given his famous "Cross of Gold" speech to a union audience and concluded by asking listeners to contribute to help him fight the powers of Wall Street, without a similar, state-mandated, addendum.[8]

Furthermore, to the extent Ohio is seeking to ensure that there is no actual coercion, the state already has a law making it illegal to:

[C]oerce, intimidate, or cause harm to another person by an act or failure to act, or [to] threaten to coerce, intimidate, or cause harm to another person, because that other person makes or does not make a contribution to a candidate, campaign committee, political party, legislative campaign fund, or political action committee.

O.R.C. § 3517.09(B). We think that the state's additional interest in informing workers and union members of their right not to be coerced and to refrain from making contributions can be vindicated through measures such as labor laws requiring that corporations and unions inform employees and members of such laws when they begin work at a company or become members of a labor organization. Annual reminders of these rights might also be sufficiently narrowly tailored. It may even be permissible for states to require a "no coercion" disclaimer on written solicitations distributed by corporations and unions to employees and members. *Cf. Gable v. Patton*, 142 F.3d 940, 944–

---

**8.** And, as we make clear in our discussion of section 3517.082(D), *infra* at 13–19, if the solicitation was for a PAC established or administered

by a corporation or union, both of the examples above would be illegal because the solicitation was not in writing.

45 (6th Cir.1998) (Kentucky requirement that advertisements supporting a political candidate contain identification of the sponsor is constitutional). But it is clear that the disclaimer required by section 3517.09(C) is not narrowly tailored and unconstitutionally infringes on core First Amendment rights. Therefore, we affirm the district court's order enjoining this provision.

**B. Section 3517.082(D) is Unconstitutional**

■■■ Section 3517.082(D) imposes three constraints on soliciting political contributions from corporate employees and union members. First, it requires that all solicitations of employees and members by corporations and unions for contributions to a PAC established or administered by the corporation or union be made in writing. It also limits corporations and unions to making four such solicitations per year. Finally, it requires that any person soliciting employees of a corporation or members of a union for contributions to a corporate or union PAC notify the employee or member that they may refuse to make a contribution and that their employment with the corporation or membership in the union will not be affected by their decision to contribute or not to contribute.

This statute's compelled speech provision is almost completely redundant with section 3517.09(C). It differs only in that it compels parties other than labor organizations and corporations to tell employees and union members at the time of a solicitation for a corporate or union PAC that they may refuse to contribute without suffering any adverse repercussions. These differences, however, do not make the compelled speech any less offensive to the First Amendment. Section 3517.082(D)'s compelled speech provision suffers from the same infirmities that compelled us to declare section 3517.09(C) unconstitutional.

Section 3517.082(D)'s other restrictions on solicitations for contributions to the PACs and separate segregated political funds of corporations and unions also violate the First Amendment rights of the plaintiffs-appellees. The restriction limiting solicitations for contributions to four times a year is a direct limitation on the quantity of a type of core

political speech entitled to the greatest protection under the First Amendment. This conclusion is compelled by two lines of Supreme Court precedent. The first line of cases has already been discussed. These cases teach us that "[r]egulation of solicitation 'must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech ... and for the reality that without solicitation the flow of such information and advocacy would likely cease.'" *Riley*, 487 U.S. at 796, 108 S.Ct. 2667. *Riley* said this in the context of analyzing regulations pertaining to solicitations of charitable contributions. It seems even more applicable when it is political solicitations, which necessarily are intertwined with core political speech, that are being regulated.

The second line of cases is represented by *Meyer v. Grant*, 486 U.S. 414, 421–22, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988). *Meyer* reasoned that the circulation of a petition to obtain signatures for a statewide ballot initiative involved core political speech. This was because circulating such a petition necessarily involved expression and discussion of political issues because to get signatures a petition circulator must persuade citizens that they should support placing an issue before the electorate. *Ibid.* The Supreme Court viewed this type of interactive communication concerning the merits of political issues as epitomizing core political speech. *Id.* at 422, 108 S.Ct. 1886. Similarly, a person soliciting union members or corporate employees to make contributions to a PAC established or administered by a corporation or union must persuade the union members and employees that the political causes that such committees or funds advance are deserving of their financial support. This certainly involves the type of interactive communication that the *Meyer* Court considered core political speech, for which the "importance of First Amendment protections is 'at its zenith.'" *Id.* at 425, 108 S.Ct. 1886.

The Colorado law challenged in *Meyer* prohibited paying petition circulators to assist in obtaining the requisite number of signatures necessary to get a statewide ballot initiative on an issue. It did not survive strict scrutiny

because it impermissibly interfered with the core political speech associated with circulating a petition for a ballot initiative by "limit[ing] the number of voices who will convey appellees' message and the hours they can speak, and therefore, ... the size of the audience they can reach." *Id.* at 422–23, 108 S.Ct. 1886. The state could not "demonstrate" that it was necessary to burden core First Amendment rights to meet its concerns about ensuring sufficient grass roots support for ballot initiatives and the integrity of the initiative process because these concerns were either not weighty enough or were already adequately addressed by other regulations. *Id.* at 425–26, 108 S.Ct. 1886.

The same is true in this case. The state asserts two distinct and "important government interests" furthered by limiting solicitations to four times a year: (1) the interest in allaying public concern that large contributors exercise undue influence over public officials and issues; and (2) the interest in reducing the risk that repetitive, oral requests for contributions will result in employees and union members being coerced into giving.

The state's interest in ameliorating undue influence that large contributors may have over politicians can be addressed by limits on how much PACs and individuals can contribute to an individual candidate, *see Buckley*, 424 U.S. at 58, 96 S.Ct. 612, and by limits on how much they can contribute to a political committee, *see California Med. Ass'n v. Federal Election Comm'n*, 453 U.S. 182, 195–96, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981).[9] Instead of settling for one of these permissible measures that directly attack the threat of

undue influence by large contributors, Ohio seems to be attacking the problem by an indirect route that takes it into forbidden territory.

It is difficult to see how one could reason that the four-times-a-year limit will ameliorate the risk that unions and corporations will have undue influence over politicians because of their large contributions, unless one assumes that the limitation will shrink the size of contributions made by corporations and unions. This might follow if one further assumes that the limitation will reduce the total amount of money unions and corporations are able to raise and thereby reduce the amount of money they can give. Thus, this approach cannot be causally related to its asserted purpose unless it is intended to reduce the amount of money corporations and unions would otherwise be free to raise to advocate their political views.

*Buckley* clearly stated that government may limit the amount of money an individual or group can *contribute* to a political candidate or political committee to protect the integrity of the electoral process. 424 U.S. at 20–21, 96 S.Ct. 612. It made equally clear that the First Amendment will not tolerate restrictions on *expenditures* individuals or groups may make to engage directly in political speech. *Id.* at 19–20, 96 S.Ct. 612. The four-times-a-year limit on solicitations can only further Ohio's asserted interest if it places obstacles in the path of the affected parties' efforts to raise money that may be used for both contributions to a candidate, cause, or group, and expenditures to engage directly in political speech.[10] Given this

---

9. On April 13, 1998, Governor Voinovich signed into law Ohio Senate Bill 134, which subjected unions and their PACs to campaign contribution limits. WESTLAW, 1998 Ohio Laws File 145, 122nd General Assembly 1998.

10. Another disturbing aspect of the four-times-a-year limit on solicitations is that it appears to be a regulation aimed at diminishing what is perceived as the unduly loud political voice of unions and corporations. It does not expressly limit expenditures unions and corporations can make to engage directly in political speech. Rather, it seeks to reduce the amount of expenditures on direct political speech by unions and corporations by constraining their ability to raise the funds necessary to make such expenditures.

Thus, as funds diminish so too will the amount of political speech by unions and corporations. To the extent that this is an effort to "level the playing field" and enhance the political voice of other less organized or less affluent segments of society (as well as those whose political voice cannot be regulated consistent with the First Amendment—the media) relative to that of unions and corporations, it is impermissible. As the Court explained in *Buckley*: "[T]he concept that government may restrict the speech of some elements of society in order to enhance the relative voice of others is wholly foreign to the First Amendment...." 424 U.S. at 48–49, 96 S.Ct. 612. This is because once states are permitted to act as guardians responsible for ensuring the diversity and balance of political discourse, the

overbreadth inherent in section 3517.082(D), it is not narrowly tailored enough to survive strict scrutiny. The state's interest is adequately protected by contribution limits. Such limits are narrowly tailored because they inhibit the quid pro quo corruption that may follow from large contributions. They do this, however, without concomitantly retarding the ability of the affected parties to engage directly in political speech to the extent they would be able to do so through their own efforts absent the regulation.

Another difficulty with the four-times-a-year limitation is its effect on the decision to speak at all by soliciting. If a union decided to solicit its members at the start of the year and then again around the time of early presidential primaries, it might find itself literally forced to choose between trying to fund speech for state primaries in June, for example, or being able to make several big pushes closer to the November elections. The First Amendment absurdity of the law is shown by the very real possibility that a company or union might find that in late October it was literally gagged of the opportunity to raise money to support an important political candidate or principle because it had earlier spoken too much. The First Amendment simply does not permit this parsimonious approach to political speech.

As for the asserted interest in reducing coercion that may result from repeated oral solicitations, in the previous section discussing section 3517.09(C) we explained that more narrowly tailored methods exist to protect this interest. This previous discussion of more narrowly tailored ways to guard against coercion also explains why we reject the four-times-a-year limit as not narrowly tailored.

We also reject section 3517.082(D)'s requirement that all solicitations be made in writing. Requiring the actual solicitation for political contributions to be made in writing clearly diminishes the interactive aspect of the communication that the First Amendment seeks to protect. We think it beyond peradventure that the dialogue on political issues accompanying a solicitation for a political contribution will be inhibited if the solicitation must be conducted by way of a back and forth exchange of message pads between the solicitor and the solicitee. The "in-writing" requirement would preclude a labor organization official from ending his speech to members with a call to drop a dollar in the bucket to help the union PAC fund efforts to get pro-union measures enacted and pro-union candidates elected. Like the four-times-a-year limit, we cannot see how this requirement will reduce undue influence over politicians and public issues unless it is intended to create an obstacle to the political fundraising by which the affected entities could otherwise pay for both political expenditures and contributions. As we have already explained, the threat contributions pose to the integrity of the electoral process can be dealt with through contribution limits that do not impair the ability of organizations to make political expenditures.

We are also unable to see how the in-writing requirement is *necessary* to further the compelling state interest in protecting workers and union members from coercive solicitations. As we noted earlier, Ohio law already makes it illegal to:

> coerce, intimidate, or cause harm to another person by an act or failure to act, or [to] threaten to coerce, intimidate, or cause harm to another person, because that other person makes or does not make a contribution to a candidate, campaign committee, political party, legislative campaign fund, or political action committee.

O.R.C. § 3517.09(B). Parties willing to violate this law will not be deterred from doing so by a law requesting them to make their solicitations in written form. If workers are informed of their right to decline to contribute and are made aware of laws prohibiting coercive solicitations when they become employees of a corporation or members of a union, they have all the protection they need. *See Meyer*, 486 U.S. at 425–26, 108 S.Ct. 1886 (finding state's interest in insuring that ballot initiatives have "sufficient grass roots support" insufficient because that interest was

---

eternal question arises *"Quis custodiet ipsos Custodes?"* ("who is to guard the guards themselves?"). JUVENAL, *Satire VI, in* THE SATIRES 51 (Rev. Lewis Evins trans.) (1872).

already "adequately protected" by existing laws). The in-writing requirement adds nothing unless it is presumed that oral solicitations are inherently coercive even when not accompanied by improper threats. We have been presented with no evidence that this is so. We are not prepared to restrict core First Amendment rights on the basis of unsupported speculation that because a solicitation is made by spoken rather than written words, an adult will feel coerced into making a contribution he or she would not have otherwise made. *See id.* at 426, 108 S.Ct. 1886 (holding ban on paid petition circulators not justified by mere "speculation" that professional circulators posed threat to the integrity of ballot initiative process).

### C. Subsection (H) of Section 3599.031 is Constitutional

Subsection (H) of section 3599.031 prohibits public employers in the state of Ohio from administering a wage checkoff through which public employees donate some portion of their paychecks to political causes. The State of Ohio claims that this ban is a constitutionally permissible effort to take partisan politics out of public workplaces. All parties, the court below, and this court agree that there is no constitutional right to wage checkoffs to support political causes. Nevertheless, the district court held that this provision violated the plaintiffs' rights to free speech and free association under the First Amendment and their right to equal protection under the Fourteenth Amendment. We disagree.

#### 1. *The Ban on Checkoffs Does Not Impinge First Amendment Rights*

The plaintiffs reason that, although the affected employees and unions have no constitutional right to have public employers administer wage checkoffs, the state's refusal to allow public employers to administer this method of fundraising significantly impairs the ability of public employees and their unions to raise funds used to promote their political agendas and favorite candidates. Thus, they contend, the state's refusal to continue to administer checkoffs for political causes unconstitutionally impairs the employ-

ees' and the unions' rights to free association and political expression.

The problem with this reasoning is that it confuses what citizens and the associations they form may do to support and disseminate their views with what citizens and groups they form may *require* the government to do in this regard. It is important to note that it is employers rather than the unions that administer the wage checkoffs at issue, even if they are intended to benefit employees. This is important because the First Amendment only "protects individuals' 'negative' rights to be free from government action and does not create 'positive' rights-requirements that the government act." Bradley A. Smith, *Money Talks: Speech, Corruption, Equality, and Campaign Finance*, 86 GEO. L.J 45, 67 (1997); *see also,* Lillian R. Bevier, *Specious Arguments, Intractable Dilemmas*, 94 COLUM. L REV. 1258, 1277 (1994) (the First Amendment "is a source of negative rights against the government, not a repository of positive entitlement to government favors."). It is also significant that the provision prohibits public employers from administering wage checkoffs for "*any* candidate, separate segregated fund, political action committee, legislative campaign fund, political party, or ballot issue." O.R.C. § 3599.031(H) (emphasis added). The provision does not single out political contributions to only certain parties, candidates or issues. All Ohio public employees are denied the benefits that might be derived from such publicly-administered programs, regardless of the content of their political views or their party affiliation.

The wage checkoff ban simply does not impinge, in a constitutionally significant manner, on any First Amendment rights. This is clear from cases such as *Brown v. Alexander* which held that " 'the First Amendment does not impose any duty on a public employer to affirmatively assist, or even to recognize a union.'" 718 F.2d 1417, 1422 (6th Cir.1983) (quoting *Arkansas State Highway Employees v. Kell*, 628 F.2d 1099, 1102 (8th Cir. 1980)). In *Brown*, the American Federation of State, County and Municipal Employees ("AFSCME") and some of its members challenged a Tennessee law prohibiting state em-

ployees from paying union dues through wage checkoffs because their union did not satisfy certain statutory requirements.[11] AFSCME claimed that the statute violated the First Amendment because it impaired the union's effectiveness, especially when measured against the effectiveness of unions that could satisfy the conditions for wage checkoffs. This court determined that statute did not "den[y] plaintiffs the right to speak, or to advocate, or to associate, or to petition to redress grievances, or to picket." *Id.* at 1423. Rather, it simply allowed the state to differentiate among labor unions in determining which organizations would receive the privilege of checkoffs. *Ibid.*

Four years after *Brown,* the Fourth Circuit rejected First and Fourteenth Amendment challenges to a South Carolina statute regulating wage checkoffs. *South Carolina Educ. Ass'n v. Campbell,* 883 F.2d 1251 (4th Cir.1989). The statute authorized "payroll deductions for membership dues to the South Carolina State Employees Association ['SEA']," but did not permit wage checkoffs for membership dues to the South Carolina Education Association ("SCEA"). *Id.* at 1253. The SCEA contended that the statute resulted in a "sudden and uniform loss of payroll deduction across the State" which "had a devastating effect upon the SCEA's membership, financial standing and advocacy program." *Id.* at 1255. The SCEA argued that the law violated the free association and free speech rights of the SCEA and its members, because "when membership dues are not withheld from wages, members are less likely to pay their dues and the association is impaired in its lobbying activities, legal advocacy program, and other services." *Id.* at 1256.

Noting that "there is no constitutional right to payroll deductions," the Fourth Circuit concluded that the statute was:

> facially neutral and merely defines the type of deductions the state will authorize from the paychecks of state employees. This legislation does not prohibit, regulate,

or restrict the right of the SCEA or any other organization to associate, to solicit members, to express its views, to publish or disseminate material, to engage in political activities, or to affiliate or cooperate with other groups.

*Ibid.* The Fourth Circuit continued that "[a]lthough loss of payroll deductions may economically burden the SCEA ... such a burden is not constitutionally impermissible." *Ibid.* This was because the state's decision not to subsidize the free association and free speech rights of the union and its members did not infringe on these rights even if it did undermine the realization of all of the advantages associated with them. *See ibid.* (citing *Regan v. Taxation With Representation of Washington,* 461 U.S. 540, 549–50, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983)).

*Brown* and *Campbell* are wholly consistent with Supreme Court cases acknowledging that the protections accorded to fundamental First Amendment rights do not extend to imposing a duty on government to assist the exercise of First Amendment rights no matter how much the withdrawal of such assistance undercuts the effect of exercising such rights. *See, e.g., Regan v. Taxation With Representation of Washington,* 461 U.S. 540, 545, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983); *Smith v. Arkansas State Highway Employees,* 441 U.S. 463, 465–66, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979) (holding First Amendment imposes no duty on public employers to listen to or respond to union grievances or to recognize unions, even if refusing to do so impairs union effectiveness). If a large private employer decided that it did not want itself or any of its subsidiaries to administer wage checkoffs for political causes, its employees could not claim that this decision violated the Constitution. The same is true for public employees. They have no more right than private employees to compel their employer to assist them in exercising their First Amendment rights.

■ This is not to say that the government can place conditions on the receipt of

---

**11.** The statute limits the use of wage checkoffs to pay dues to only those unions that are (1) "independent"; (2) "domestic"; (3) "committed to achieving an efficient and effective work force in

Tennessee"; and (4) represent "at least ten percent of the employees who qualified for membership." *Brown,* 718 F.2d at 1420.

state-created benefits that have the effect of dissuading people from exercising a constitutional right, even if the government has absolute discretion as to whether it will provide the benefit in the first instance. *See generally*, Richard Epstein, *Unconstitutional Conditions*, 102 HARV. L. REV. 4 (1988) (explaining the doctrine of unconstitutional conditions); Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 HARV. L. REV. 1413 (1989) (discussing the doctrine of unconstitutional conditions). This is well established in our First Amendment jurisprudence. *See, e.g., Torcaso v. Watkins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961) (citizen cannot be refused public office because he refused to declare belief in God); *Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) (government cannot condition receipt of tax exemption on people signing declaration that they have never advocated forcible overthrow of the government).

▪ The unifying principle behind this body of case law is simple. Allowing the government to decide that it will not give some people a benefit that it gives to others, even though it is not required to provide such benefit to anyone, simply because a person has exercised a right guaranteed under the Constitution, amounts to a penalty for exercising such right. *See Regan*, 461 U.S. at 545, 103 S.Ct. 1997. Allowing the government to penalize conduct it cannot directly ban raises concerns that the government will be able to curtail by indirect means what the Constitution prohibits it from regulating directly. As a practical matter, the government creates an obstacle to the exercise of the right to free association if it says to a person that he or she may keep a job in the public sector only by forswearing allegiance to certain political parties. Likewise, the government creates an obstacle to a woman's exercise of her right to terminate a pregnancy if it enacts a law withholding "all Medicaid benefits from an otherwise eligible candidate simply because that candidate had exercised her constitutionally protected freedom to terminate her pregnancy by abortion." *Harris v. McRae*, 448 U.S. 297, 317 n. 19, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). Simply put, "government may not place obstacles in the path of [a person's] exercise of [a constitutionally protected right]" by impinging on the right absent a compelling justification. *Id.* at 316, 100 S.Ct. 2671; *see also Elrod v. Burns*, 427 U.S. 347, 360–62, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). It is, however, equally clear that the government does not in any constitutionally significant way impinge on a constitutional right when it refuses to remove obstacles "not of its own creation" to the exercise of a constitutional right. *Harris*, 448 U.S. at 316, 100 S.Ct. 2671.

For example, in *Harris* the government's refusal to subsidize medically necessary abortions despite its decision to subsidize other medically necessary health procedures did "not impinge on the due process liberty [to terminate a pregnancy] recognized in [*Roe v.*] *Wade.*" *Id.* at 318, 100 S.Ct. 2671. The refusal to provide such funding left the appellees "with at least the same range of choice in deciding whether to obtain a medically necessary abortion as [they] would have had if Congress had chosen to subsidize no health care costs at all." *Id.* at 317, 100 S.Ct. 2671. The same is true in this case. We do not doubt that wage checkoffs are a great tool for maximizing political contributions from public servants. But, in the absence of the public employers administering checkoffs for political causes, all political candidates and funds, regardless of their persuasion, are left with at least the same range of options in deciding how to tap this sector of the population for contributions as they would have had if the state had chosen not to allow any employers to administer wage checkoffs. And more to the point, public employees are left with the same range of options in deciding how to best pool their resources in furtherance of a common cause.

In summary, the affected parties have no constitutional right to checkoffs. The privilege of checkoffs is not being denied to penalize the exercise of constitutionally protected rights. Nor are checkoffs being conditioned on refraining from exercising a constitutional right. Thus, it cannot be said that the state has impinged in any way on the First Amendment rights of public employees and their unions by prohibiting public employers

(in effect, itself) from administering check-offs. Therefore, we reverse the district court's ruling that section 3599.031(H) violates the First Amendment by prohibiting public employees from utilizing wage checkoffs for political causes.

### 2. *The Equal Protection Challenge Fails*

 Since there is no First Amendment violation in the wage checkoff ban, the remaining question is whether it violates the Constitution to deny the affected workers checkoffs because of their status as public employees. The public employees assert that the wage checkoff ban in subsection (H) violates the Equal Protection Clause of the Fourteenth Amendment because it denies public-sector employees, but not private-sector employees, this highly efficient method of fundraising. When a law apportions benefits or burdens on the basis of a classification among citizens, it will be subject to strict scrutiny if the classification involves a suspect class or affects a fundamental right. *Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). If the classification involves a quasi-suspect class, such as gender or illegitimacy, it will be subject to intermediate level scrutiny requiring that the law substantially further a legitimate state interest. *Craig v. Boren,* 429 U.S. 190, 191–92, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Mathews v. Lucas,* 427 U.S. 495, 505, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976). If the classification does not involve a suspect or quasi-suspect classification or affect a fundamental right, it will be reviewed to determine whether it is rationally related to any conceivable legitimate state interest. *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Under the rational basis standard "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Ibid.*

The equal protection challenge to Ohio's wage checkoff ban must be evaluated under a rational basis standard. As previously explained, the wage checkoff ban does not "impinge" on any First Amendment rights. Furthermore, the status of being a public employee has never been deemed either a suspect or quasi-suspect classification. Although it is the state acting in this case, we see no significant difference between what Ohio has done here and what a large corporation might do by ordering all of its subsidiaries to stop administering checkoffs for political causes. Public employees have no greater rights than their private-sector counterparts to challenge such decisions. Ohio's wage checkoff ban satisfies rational basis scrutiny given the state's professed interest in removing partisan politics from places of public employment. The Ohio legislature rationally could have determined that ending wage checkoffs would remove a minor vestige of partisan politics from places of public employment. We cannot say that this is not a legitimate and rational concern sufficient to defeat the Appellees' equal protection claim. To the extent the district court concluded otherwise, we reverse.

### D. Subsection (I) of Section 3599.031 Violates the Contracts Clause

 Subsection (I) of section 3599.031 mandates that the wage checkoff ban of subsection (H) supersedes any provision in a pre-existing agreement between public employers and labor organizations granting public employees the right to wage checkoffs for political causes. Subsection (I) is challenged as violating the Contracts Clause of the United States Constitution. We find this contention to be meritorious.

Article I, section 10 of the United States Constitution provides that "No State shall … pass any … law impairing the Obligation of Contracts." In *Federalist 44,* James Madison characterized the Contracts Clause as a "constitutional bulwark in favor of personal liberty and private rights." However, it is clear that this "prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula." *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 428, 54 S.Ct. 231, 78 L.Ed. 413 (1934). Contracts Clause jurisprudence evinces a concern for ensuring that the regulatory power of the States is not eviscerated by a per se ban on legislation impairing private contracts. *See United States Trust Co. of New York v. New Jersey,* 431 U.S. 1,

22, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). Citizens cannot be permitted to place *any* matters they wish beyond the reach of the state's police power merely by entering into a contract. But the Supreme Court's Contracts Clause jurisprudence also recognizes the "high value" the Framers placed "on the protection of private contracts." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). After all, "[c]ontracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them." *Ibid.* Thus, this body of law recognizes that "private contracts are not subject to unlimited modification under the police power." *Id.* at 244 n. 15, 98 S.Ct. 2716. The conflicting values of protecting the right of individuals to order their affairs by contract and allowing the states to exercise " 'essential attributes of sovereign power' which are necessarily reserved by the states to safeguard their citizens" are both recognized in the analytic framework used to assess Contracts Clause claims. *Linton v. Commissioner of Health and Env't*, 65 F.3d 508, 517 (6th Cir.1995).

This analytic framework first requires us to determine whether the complaining party has established that the challenged legislation in fact operates as a ".'substantial impairment of a contractual relationship.'" *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). A substantial impairment may exist even where there has not been a "[t]otal destruction of contractual expectations." *Ibid.* If a substantial impairment exists, the "severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." *Ibid.* In assessing the extent of the impairment, we consider the industry in which the complaining party is involved. If that enterprise has previously been regulated with respect to the particular aspect that is the subject of the challenged legislation, then it may be assumed that further legislation of that specific area does not work as substantial an impairment as a law affecting a hith-

erto unregulated aspect of the industry. *See ibid.*

Once it is determined that the state regulation is a substantial impairment and the extent of the impairment is measured, the burden shifts to the state. The state must proffer a "significant and legitimate" public purpose for the regulation warranting the extent of the impairment caused by the measure. *Ibid.* If the state proffers such a significant and legitimate public purpose for the regulation, the court must determine whether "the adjustment of the 'rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.' " *Energy Reserves*, 459 U.S. at 412, 103 S.Ct. 697 (alterations in original) (quoting *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 22, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977)). When the impaired contract is between private parties "[n]ormally, we defer to the state's judgment" as to the necessity and reasonableness of a measure. *Linton*, 65 F.3d at 519. But, when the state itself is a contracting party, we will look to see whether the state's self-interest makes such deference inappropriate. *Linton*, 65 F.3d at 519.

Applying this mode of analysis to the present case, it is clear that subsection (I) of section 3599.031 operates as a substantial impairment of the state's contractual relationship with public employee unions whose CBAs expressly grant the right to checkoffs for political purposes. The measure totally obliterates the affected workers' contractual expectation that the state will allow them to use this highly effective method of political fundraising for the term of the CBA. The record makes clear that the affected unions and their local affiliates were well aware at the time they negotiated and entered into the collective bargaining agreements at issue that over 90% of the financial support for AFSCME's PAC targeting national political candidates and issues comes from wage checkoffs. As we have already noted, it is beyond peradventure that the Constitution does not obligate the state to administer wage checkoffs for the unions no matter how

minimal a burden this creates. However, we are equally certain that the union members and the union officials who negotiated the affected CBAs considered the promise by public employers to administer the checkoffs a significant and important aspect of their collective bargaining agreements.

The state concedes that the challenged measure impairs a right secured by some pre-existing CBAs that public employers entered into with public employee unions. It argues, however, that these impairments are not substantial for two reasons: (1) because the affected workers have not shown that the wage checkoff provision in the CBAs was one that "induced the parties to contract in the first place"; and (2) because both labor agreements and elections are highly regulated areas.

The state cites the Fourth Circuit case of *Baltimore Teachers Union v. Mayor and City Council of Baltimore*, 6 F.3d 1012 (4th Cir.1993). Upon review of Judge Luttig's thoughtful opinion in that case, it is clear to us that the state misconstrues the opinion to the extent it claims that a substantial burden cannot exist unless the affected term was a term that induced the parties to contract in the first place. This is because the opinion states "we are confident that, *at the very least,* where the contract right or obligation impaired was one that induced the parties to enter into the contract ... the impairment must be considered 'substantial' for purposes of the Contracts Clause." *Id.* at 1018 (emphasis in original). This language declares that showing the affected term induced the parties to enter into the contract is *sufficient* to establish a substantial impairment for purposes of the Contracts Clause. It cannot be construed as declaring that such a showing is *necessary* to establish a substantial impairment. Just as the Fourth Circuit in *Baltimore Teachers Union* did not state a general rule for determining what is necessary to establish a substantial impairment, we find that this case does not require us to do so. It merely requires us to determine whether the impairment in this case is substantial. We think it is because the state has completely deprived the affected workers and their unions of a meaningful benefit they negotiated for in their CBAs.

The fact that labor agreements and elections are highly regulated does not alter our conclusion. Again, the state misconstrues the applicable precedents. The substantiality of an impairment is not discounted simply because the affected contract provision is in some way connected to a previously regulated area. Rather, prior regulation of a field mitigates the substantiality of an impairment only to the extent that it opens a contracting party's eyes to the prospect of changes in the existing regulations or to new regulations that may affect the value of negotiated terms in the contract. As the Eighth Circuit explained, this makes sense because if the complaining party could see it coming, it can reflect the possibility of interference in the negotiated price, "and thus the value of performance is not reduced." *Holiday Inns Franchising, Inc. v. Branstad,* 29 F.3d 383, 385 (8th Cir.), *cert. denied,* 513 U.S. 1032, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994).

This is consistent with existing Supreme Court precedents relying upon the heavily regulated nature of an industry as grounds to discount the severity of impairments resulting from subsequent regulations. In *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983), the state passed a law establishing a price ceiling on natural gas in the intrastate market. The complaining natural gas companies had previously entered into agreements with a state-run utility containing indefinite price escalator clauses. *Id.* at 403–04, 103 S.Ct. 697. They claimed that in the wake of federal deregulation, a state-imposed price ceiling impaired their expectation of higher prices under the escalator clauses. The Supreme Court found that the gas companies' "reasonable expectations [had] not been impaired by the Kansas Act." *Id.* at 416, 103 S.Ct. 697. The Court relied essentially on two facts in reaching its conclusion that the companies knew their "contractual rights were subject to alteration by state price regulation." First, the affected contracts were entered into before prices were deregulated, which indicated that the companies never expected to receive deregu-

lated prices. *Id.* at 415, 103 S.Ct. 697. Second, although the State was not regulating prices for intrastate gas at the time the agreements were made, the State had previously regulated the price of natural gas and had been regulating the production, distribution and sale of natural gas for seventy-five years. *Id.* at 415 n. 17–18, 103 S.Ct. 697.

Elections are a highly regulated area in the sense that they are run by the State, and are subject to detailed regulation, as to how elections are to be conducted free of fraud or coercion, and as to how candidates are selected and placed on the ballot. At the same time, elections are the occasion for quintessential core political speech concerning the choice of how and by whom we will be governed. They must therefore also be considered an area to be regulated very lightly, if at all, in that respect. Thus, one choosing to enter the arena of political discourse and influence should not be considered on a par with one who has willingly injected himself into a rather dubious enterprise and must take the consequences thereof. *See Exxon Corp. v. Eagerton,* 462 U.S. 176, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983); *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983).

In the present case, Ohio simply alludes to the fact that labor agreements and elections are heavily regulated. It does not point to any specific regulations that it claims placed the affected unions and workers on notice that their contractual right to wage checkoffs might be extinguished during the term of the CBAs they negotiated. Nor has our independent review of Ohio's past and current regulation of labor agreements and elections uncovered anything that should reasonably have put the unions and workers on any notice that the legislature would simply abolish one section of their bargained-for benefits. Accordingly, we see no reason to discount the extent of the impairment created by the application of the wage checkoff ban

to pre-existing collective bargaining agreements with public employees.

▮ The state proffers [12] four justifications for this severe impairment of the unions' contractual rights: (1) preventing political corruption and the appearance of corruption; (2) ensuring that public employees are not coerced into making contributions; (3) avoiding entangling alliances between public sector employment and political parties; and (4) preventing the politicization of government offices. The state does nothing more than posit these justifications. Ohio's Campaign Finance Reform Act has no legislative history. The statute does not contain a statement of purpose. We have absolutely no basis for determining why this law was enacted beyond the four *post hoc* justifications asserted by the state. This is cause for grave concern, given the circumstances of this case.

The state may indeed have been motivated by one of the justifications it now asserts. However, even if all of these alternative motivations are imputed to the state, we cannot defer to the state's judgment that to effectuate these goals the substantial impairment of existing contracts was necessary and reasonable. This is because the state has an obvious self-interest in muting public employee unions. The unions seek to compel public employers to give union members the greatest remuneration and benefits available in exchange for the workers' labor. As an employer, the state has an interest in diminishing the ability of public employees to gain the support of politicians and citizens in their efforts to maximize their remuneration. Since the state has a compelling self-interest in abrogating its obligation to permit checkoffs that fund union political activities, and because obliterating these terms constitutes a very severe impairment, we must carefully scrutinize whether it is necessary and reasonable for the state to terminate the right to checkoffs in pre-existing CBAs to further any of the asserted interests.

---

**12.** Unlike the rational basis inquiry we applied to the equal protection claim, we will not impute to the state any motivation we can conceive of but will consider only those that they assert. There is absolutely no basis in existing Contracts Clause jurisprudence for courts granting states the benefit of the courts' imagination in attempting to justify measures substantially impairing contracts.

We do not think that this severe impairment of pre-existing CBAs is either a necessary or reasonable measure to prevent political corruption and the appearance of corruption. We cannot see how workers being presented with the option to make checkoffs to their union's PAC fosters political corruption to a degree warranting the impairment of a contract. Cases such as *Buckley* recognize that large contributions to a candidate pose a threat of corruption because a politician may promise to do the bidding of large contributors. Checkoffs are quite different. Not even a labor-friendly politician is likely to promise favors to a public employee in return for the employee's promise to contribute a few dollars a month to the union's PAC, in the hope that the contribution will increase the amount of money the politician is able to coax out of the union's coffers. The state already has a law limiting how much a union can give to a candidate.[13] The state also prohibits people from soliciting contributions for PACs, legislative campaign funds, political parties, and campaign committees from public employees while the employees are performing their official duties or while they are in those areas of a public building where official duties are performed. O.R.C. § 3517.092.

Nor do we think that the state's effort to evade its contractual obligation is justified by the desire to ensure that public employees are not coerced into making contributions. This interest is already protected by laws against coercive solicitations. *See* O.R.C. § 3517.09. It could be further promoted by regulating the way checkoffs are done rather than by terminating them. For instance, the state could prohibit the dissemination of information regarding whether and how much employees contributed. Since the state, not the unions, administers the checkoffs, it can code contribution data just as universities disguise student names on grade postings. In short, the state has already taken many steps to ensure that contributions are not the result of coercion and it can enact additional safeguards short of reneging on its contractual obligation to permit public employees to contribute through wage checkoffs if they so desire.

We are not sure what to make of the state's claim that the very substantial impairment of the CBAs is necessary and reasonable to serve the significant and legitimate end of avoiding entangling alliances between public sector employment and political parties. We are, however, sure that even if we impute to this phrase a meaning that constitutes a significant and legitimate public purpose, it is neither necessary nor reasonable for the state to renege on its contract to achieve this goal. The same is true of the state's asserted interest in preventing the politicization of government offices. The Hatch Act cases the government cites in its brief (see, *e.g., U.S. Civil Serv. Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973)) demonstrate that the state has numerous equally if not more effective means at its disposal to further this goal without substantially impairing its contracts with the unions. The fact that ridding the workplace of the taint of partisan politics survives rational basis scrutiny for purposes of our equal protection analysis does not mean that it justifies a very substantial impairment of a pre-existing contract. Something more than the showing made to survive rational basis scrutiny is required to justify such an impairment. The hurdle is even higher given the state's obvious self-interest and the lack of any evidence as to what actually motivated the state to seek to abrogate its contractual obligation.

The state has been permitting checkoffs for quite some time. Throughout this time, it has been willing to tolerate or been unaware of the evils it now claims are associated with permitting public employees and their unions to utilize checkoffs for political causes. If the state has known of, but tolerated, these problem throughout this time, it can tolerate them a bit longer until its contractual obligations expire. If the state's concern is the result of a recent epiphany, it has failed to persuade us that the newly

---

13. As we previously noted, *supra* at note 9, on April 13, 1998, Governor Voinovich signed into law Ohio Senate Bill 134, which subjected unions and their PACs to campaign contribution limits. WESTLAW, 1998 Ohio Laws File 145, 122nd General Assembly 1998.

discovered danger of checkoffs justifies the extreme solution of substantially impairing existing contracts. What is to prevent such epiphanies from serving as the basis for the state to abrogate any other contractual obligation it has undertaken? Certainly, the state is permitted to enact measures to deal with a newly discovered evil. But, the achievement of even a good goal (newly discovered) can normally wait until existing contracts expire.

In summary, we find that the state's application of the wage checkoff ban to pre-existing CBAs promising public employees the right to wage checkoffs for certain political causes is a substantial impairment of these contracts. Even if we assume that this substantial impairment was prompted by the state's asserted justifications rather than its self-interest in weakening public employee unions, and that the asserted justifications are significant and legitimate public purposes, we cannot find that the impairment was necessary and reasonable to effectuate any of the asserted ends. Therefore, subsection (I) of section 3599.031 violates the Contracts Clause.

## IV

For the foregoing reasons, the judgment of the district court is **AFFIRMED** in part and **REVERSED** in part.

MERRITT, Circuit Judge, dissenting.

Judge Boggs's opinion evinces a peculiar distaste for the campaign finance reform movement, referring to it as a "public outcry" against which the courts "must be especially vigilant" because, among other reasons, if this Ohio law is constitutional, William Jennings Bryan "could not have given his famous 'cross of gold' speech" and because our longstanding traditions favor unregulated campaign spending:

> The Declaration of Independence concludes with persons pledging, "our lives, our *fortunes,* and our sacred honor." (Emphasis added.) There were no campaign limitations on what they would spend.

Leaving aside the judicial rhetoric, the state law that the court has held unconstitutional is a relatively innocuous and mild state statute saying that when soliciting campaign contributions from union members or employees, a union or an employer shall "inform" them that "making a contribution is voluntary" and that failure to contribute will not cause retribution. I do not see this as any great burden, certainly a much lesser burden than the Minnesota prohibition on fusion or multi-party ballots upheld recently in *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997). There the Chief Justice said with respect to election and campaign regulations of the type before us that a "state's asserted regulatory interest need only be sufficiently weighty to justify the limitation imposed." *Id.* at 1372. It need only be rational. Surely informed consent regulation governing a union or employer's efforts to get members or employees to make political contributions to a favored political party, candidate, or cause should not be viewed as a "severe burden" on free speech anymore than regulations controlling various kinds of fraud and undue influence or employer threats against employees because of anti-union bias. The NLRB, the EEOC, the SEC, the FTC, as well as many other administrative agencies and the courts, frequently require employers, sellers, or others to issue notices that inform employees or other groups of their rights. *See, e.g., NLRB v. Ozanne Const. Co.,* 112 F.3d 219, 226 (6th Cir.1997), in which Judge Boggs recently upheld against an overbreadth attack an NLRB requirement that an employer must give its employees notice informing them of their § 7 rights to be free of coercion. Such cases are legion. That is the same thing that is happening here. It should not be cause for constitutional alarm nor incite the federal judiciary to substitute its judgment for the enactment by a state's duly-elected representatives of an informed consent statute protecting employees from demands for campaign contributions.

I regard § 3517.082(D) as equally mild and innocuous. It requires that union and employer political solicitation be in writing and "not be made more than four times during each calendar year." It is a device to re-

strain unions and employers from frequently badgering their people for political contributions and to regularize and record the relationship. The writing requirement is no more than a kind of Statute of Frauds designed to ensure propriety and clarity and create a record of the transaction. It is no more onerous or unconstitutional than the similar writing requirement for contracts contained in the Statute of Frauds first passed by Parliament in 1677 during the reign of Charles II and now adopted in some form by almost every state. There is surely some force to the argument that there should be, in common prudence, some impersonal evidence available when serious matters are at stake. A writing would clarify the purpose of the transaction and tend to deter overreaching and coercion of subordinates by union leaders and company management.

Nor does the anti-checkoff provision concerning political contributions violate the Contracts Clause. The plaintiffs have not shown "substantial impairment" of the collective bargaining agreement by immediate application of the anti-checkoff provision to the agreement. There is no evidence that this is a key term in the collective bargaining agreement and of significant import to union members. The wage checkoff provision is incidental to the collective bargaining agreement as a whole. It does not go to the essence of the contract.

Furthermore, as pointed out by the state, the collective bargaining process is heavily regulated, making this minor adjustment to an agreement that is already heavily regulated insubstantial. The state has articulated a legitimate reason for the anti-checkoff provision in the statute, which we have found constitutional, and I cannot see where the immediate elimination of the wage checkoff term from the collective bargaining agreement substantially impairs the overall agreement.