RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0028p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MICHIGAN STATE AFL-CIO; UTILITY WORKERS UNION OF AMERICA, LOCAL 223; GEORGE HORUCZI; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO, LOCAL 58; MICHIGAN STATE UTILITY WORKERS COUNCIL; WILLIAM D. CHADWICK, JR.,

> *Plaintiffs-Appellees*,

*v.*

WILLIAM SCHUETTE; RUTH JOHNSON,

> *Defendants-Appellants*.

┐
│
│
│
│  No. 16-2100
│
│
│
│
┘

---

Appeal from the United States District Court for
the Eastern District of Michigan at Flint.
No. 4:16-cv-11454—Linda V. Parker, District Judge.

Argued: February 2, 2017

Decided and Filed: February 9, 2017

Before: SUHRHEINRICH, SUTTON, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Erik A. Grill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Andrew A. Nickelhoff, SACHS WALDMAN, P.C., Detroit, Michigan, for Appellees. **ON BRIEF:** Erik A. Grill, Denise C. Barton, Adam Fracassi, Joseph Y. Ho, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Andrew A. Nickelhoff, SACHS WALDMAN, P.C., Detroit, Michigan, John R. Canzano, MCKNIGHT CANZANO SMITH RADTKE & BRAULT P.C., Royal Oak, Michigan, Robert D. Fetter, MILLER COHEN PLC, Detroit, Michigan, for Appellees. Robert L. Avers, DICKINSON WRIGHT PLLC, Ann Arbor, Michigan, for Amicus Curiae.

---

**OPINION**

---

SUTTON, Circuit Judge.    The Michigan Campaign Finance Act generally bars corporations and labor unions from contributing to political candidates and organizations.  As an exception to this prohibition, it permits corporations and unions to form and contribute to political action committees, which in turn may make political contributions.  A recent amendment to the Act defines a prohibited expenditure by corporations and unions to include the administrative expenses of operating a payroll deduction program unless the deductions go to (1) the corporation's or union's own political action committee or (2) a political action committee established by a nonprofit corporation of which the union or corporation is a member. Several unions and some of their members challenge this component of the Act on the grounds that it violates (1) their Contracts Clause rights by upsetting existing collective bargaining agreements that already permit payroll deductions to other entities and (2) their First Amendment rights by preventing many union members from donating to their union's political action committee via automatic payroll deductions.    The district court preliminarily enjoined enforcement of the law on both grounds.  We affirm the district court's Contracts Clause ruling and reverse its First Amendment ruling.

I.

The Michigan Campaign Finance Act prohibits corporations from making "contributions" to, or "expenditures" on behalf of, state political candidates except through a "separate segregated fund," more commonly known as a political action committee, still more commonly known as a PAC.  *See* Mich. Comp. Laws §§ 169.254–.255; 1979–80 Mich. Op. Att'y Gen. 391 (1978).  The statute defines "contribution" and "expenditure" to cover a transfer of "anything of ascertainable monetary value" if "made for the purpose of influencing the nomination or election of a candidate, for the qualification, passage, or defeat of a ballot question, or for the qualification of a new political party." Mich. Comp. Laws §§ 169.204, .206. The statute permits corporations and unions to "make [] expenditure[s] for the establishment or administration of, and solicitation, collection, or transfer of contributions to, a separate

segregated fund to be used for political purposes." *Id.* § 169.255(1). But it prohibits expenditures for "establishing and administering a payroll deduction plan to collect and deliver a contribution to a [political action] committee," unless "made by the person that established the" fund, or, after the 2015 amendments, "by a person who is a member of a nonprofit corporation that established" the fund. R. 7-7 at 4–5.

The upshot is this: Michigan law allows corporations and unions to solicit contributions to their PACs from employees and organizational members. Mich. Comp. Laws § 169.255. If an approved employee or member agrees to contribute, the corporation or union may deduct that contribution directly from the individual's payroll through a process known as "PAC check-off." To permit this arrangement, the statute carves out from the expenditure ban any expenses associated with administering a political action committee if "made by the person that established the" fund. *Id.* § 169.204 (amended 2015).

Unions do not employ the bulk of their authorized donor base. To obtain payroll deductions in the past, unions secured agreements from employers to deduct PAC contributions from union members' wages. PAC check-off agreements became a frequent component of collectively bargained contracts with employers. To ensure that the § 169.204 exception covered the payroll deduction expenses in union-employer agreements, unions would reimburse the costs that employers bore in administering the check-offs for union members. An administrative interpretation sanctioned this approach. And so the system operated—until December 2015.

At that time, Michigan amended the Campaign Finance Act. Under the 2015 amendments, any contributions or expenditures made by a corporation "to provide for the collection and transfer of contributions to" another corporate or union political action committee would "constitute[] an in-kind contribution . . . prohibited under" the statute. R. 7-7 at 44–45; Mich. Comp. Laws § 169.254(3). In addition, "[a]dvanced payment or reimbursement" could no longer "cure a use of corporate resources otherwise prohibited." *Id.* A violation of the provision came with criminal and civil penalties. R. 7-7 at 45; Mich. Comp. Laws § 169.254(5).

At the same time that Michigan prohibited corporations and unions from administering payroll deductions for others, it allowed them to administer payroll deductions for donations to

nonprofit organizations so long as the corporation or union was a member of the nonprofit.  The legislature also lifted the annual consent requirement for individual contributions, making it easier to secure continuous payroll deductions from employees.

In response to these changes, four labor unions and two union members (altogether, the unions) sued Michigan's Secretary of State Ruth Johnson and Attorney General William Schuette in their official capacities (altogether, the State), alleging violations of the First Amendment and the Contracts Clause.  The district court granted the unions a preliminary injunction on the ground that they were likely to prevail on their Contracts Clause and First Amendment claims.  The State appealed.

## II.

District courts gauge requests for a preliminary injunction based on four factors:  (1) the plaintiffs' likelihood of success on the merits; (2) irreparable harm to plaintiffs absent injunctive relief; (3) substantial harm to others resulting from an injunction; and (4) the broader public interest.  *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994).  Courts of appeals gauge requests to reverse a preliminary injunction based on two inquiries:  (1) Did the district court rely on clearly erroneous facts in assessing these considerations?  Or (2) did the court rely on an incorrect legal standard or misapply the governing standard in assessing these considerations?  *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 233–34 (6th Cir. 2011) (quotation omitted).  This case turns on the law.  The district court correctly applied the Contracts Clause and misapplied the First Amendment, and that's all we need to know to affirm in part and reverse in part.  *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007).

*Contracts Clause*.  The Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10.  The Contracts Clause has had good days, *see Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. 518 (1819), and bad ones, *see Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934), with some cases honoring its language more assiduously than others.  At one bookend is *Dartmouth College*, in which the Court, through an opinion by Chief Justice Marshall, held that the Contracts Clause protects contracts "which respect property, or some object of value," including, in that case, the charter of

a private educational institution.  17 U.S. at 629, 643–46.  At the other bookend is *Blaisdell*, in which the Court rejected a Contracts Clause challenge to a Minnesota law that banned enforcement of mortgage foreclosures that the loan agreements expressly authorized.  290 U.S. at 430, 434–35.  According to *Blaisdell*, "[t]he policy of protecting contracts against impairment presupposes" "the reservation of essential attributes of sovereign power [that can be] read into [private] contracts."  *Id.* at 435.  Today's test for assessing a Contracts Clause violation lies somewhere between the two cases.  It prohibits a State from imposing "a substantial impairment" on a "contractual relationship," *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244–45 (1978), unless that impairment amounts to a "reasonable" and "appropriate" means of achieving "a significant and legitimate public purpose," *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–12 (1983).

We need not start from scratch in applying that standard.  Almost twenty years ago, *Toledo Area AFL-CIO Council v. Pizza* addressed a similar Contracts Clause challenge to an Ohio law that barred public employers from administering automatic payroll deductions for political purposes and that applied the ban to existing collective bargaining agreements. 154 F.3d 307, 311 (6th Cir. 1998).  *Pizza* held that the law "operate[d] as a substantial impairment of the [] contractual relationship" because it "obliterate[d] the affected workers' contractual expectation that the state w[ould] allow them to use this highly effective method of political fundraising for the [agreed upon] term."  *Id.* at 323.  *Pizza* also did not think much of the State's justifications for abrogating this contractual commitment:  warding off political corruption and preventing employees from being coerced into making contributions.  *Id.* at 326–27.  It found this "severe impairment of pre-existing" agreements neither "necessary [n]or reasonable."  *Id.* at 326.

As with the Ohio law in *Pizza*, so too with the Michigan law in this case.  The Michigan law prohibits the administration of payroll deduction programs for union political action committees.  Just so in *Pizza*.  The unions have contracts that provide for payroll deductions. Just so in *Pizza*.  The Michigan law prohibits adherence to these agreements.  Just so in *Pizza*. Michigan offers no interests distinct from those considered in *Pizza* to justify removing the PAC check-off obligations from the union contracts.  Until now, Michigan, like Ohio, has "been

willing to tolerate or been unaware of the evils it now claims are associated" with PAC check-offs. *Id.* Here too, then, the State may "tolerate them a bit longer until [the] contractual obligations expire." *Id.* *Pizza* establishes a substantial likelihood, indeed an overwhelming probability, that the unions will succeed on their Contracts Clause claim.

Not so quick, responds the State. It says that there is no reason to worry about *Pizza* because the unions have not shown that their collective bargaining agreements contain reimbursement clauses, and without these clauses the contracts cannot be enforced. The unions, it is true, have placed short excerpts from only two contracts into the record, and neither excerpt contains a reimbursement provision. But this argument does not supply a basis for denying the unions' request for a preliminary injunction. A contract need not state that it will operate in accordance with governing law to be valid. And if the unions wish to enforce the PAC check-off provisions during the rest of the collective bargaining agreement, they of course will have to reimburse the employers for those costs. The unions conceded as much during oral argument. In the aftermath of that concession, the State could not identify any fiscal prejudice it would suffer if these contracts operate in compliance with the reimbursement requirement through the end of the collective bargaining agreement.

Even so, Michigan adds that we can avoid the Contracts Claim altogether by construing the 2015 amendment to apply only to future collective bargaining agreements. But the law offers no basis for this limitation. And we will not invent one.

None of the other preliminary injunction considerations have any role to play here. The debate is a legal one, and the unions are on the right side of it. The Contracts Clause, then, provides relief to the unions in part, prohibiting the State from enforcing the contested provision against regulated entities with pre-existing PAC check-off obligations through the end of the relevant collective bargaining agreements. But the unions seek relief in full, which brings us to the First Amendment claim.

*First Amendment.* "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The guarantee extends to speech by incorporated entities, including for-

profit corporations, nonprofit corporations, and unions.  *Citizens United v. FEC*, 558 U.S. 310, 342 (2010).

The essence of the unions' claim is that the 2015 amendment amounts to a viewpoint restriction on speech.  The problem with this claim is that it has been thrice rejected—once by the United States Supreme Court and twice by our court.  All three cases have held that the elimination of a PAC check-off opportunity does not amount to a restriction on speech and thus does not abridge the speech rights of unions hoping to receive check-off donations.  *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 359 (2009); *Bailey v. Callaghan*, 715 F.3d 956, 958 (6th Cir. 2013); *Pizza*, 154 F.3d at 319.

In *Ysursa*, *Pizza*, and *Bailey*, state laws prohibited government employers from administering payroll deductions for donations to union political funds.  *Ysursa*, 555 U.S. at 356; *Pizza*, 154 F.3d at 311; *Bailey*, 715 F.3d at 958.  All three cases held that the laws did not restrict union speech.  In *Ysursa*, the Court stated that while payroll deduction could "enhance the unions' exercise of First Amendment rights," a refusal to permit public payroll deduction was "not an abridgment of the unions' speech" because they were still "free to engage in such speech as they s[aw] fit."  555 U.S. at 359 (quotation omitted).  This court had reached a similar conclusion two decades earlier.  *Pizza* held that the "wage checkoff ban simply [did] not impinge, in a constitutionally significant manner, on any First Amendment rights."  154 F.3d at 319.  *Ysursa* cited, and relied on, *Pizza* for this point.  555 U.S. at 359.  *Bailey* recently removed any lingering doubt.  Elimination of PAC check-off, we said, did "not restrict the unions' speech at all:  they remain[ed] free to speak about whatever they wish[ed]."  *Bailey*, 715 F.3d at 958.

What was true then about opportunities to speak with one's pocketbook is even more true today.  Gone are the days when hard copy checks amounted to the primary, almost only, currency of—legal—political fundraising.  The ever-growing modern options form a colorful array—from the once new and now traditional (monthly credit card or automatic bank withdrawals) to the now avant-garde and soon to be traditional (PayPal or Venmo).  As a practical matter, unions retain a number of effective options for soliciting political donations and union members have a number of ways for making them—say a monthly bank account withdrawal, which is little different from a monthly paycheck withdrawal through a PAC check-

off.  Even if PAC check-off offers efficiencies that other methods of fundraising do not, modern methods of seeking and making contributions have minimized the relative significance of them.

That the employers in *Ysursa*, *Pizza*, and *Bailey* were public rather than private entities does not change things.  In particular, the distinction fails to explain why the *unions* would be in any different position now.  If the elimination of PAC check-off does not restrict union speech, as these cases hold, it never restricts union speech—regardless of who operates the check-off program.  As in these cases, the unions remain free to collect donations and to use those donations for political purposes.  Just as unions do not have a constitutional right to government-subsidized speech, *e.g.*, *Ysursa*, 555 U.S. at 359, they do not have a constitutional right to corporate-subsidized speech.

All of this explains why *Citizens United* provides no traction for the unions.  There, a nonprofit corporation successfully challenged a law that prevented corporations from using general treasury funds for political contributions or "electioneering" expenditures.  558 U.S. at 321–22.  The Act imposed a direct restraint on the plaintiff's speech.  Indeed, it sidelined all corporations from certain forms of political speech.  Michigan's law, by contrast, prevents one distinct entity from subsidizing another entity's speech.  It does not limit the amount of money unions can raise or spend.  And it does not specify the subjects or organizations to which they can donate or on which they can spend.  That makes all the difference.

Wait, the unions urge:  What of the following language from *Pizza*?  The First Amendment, *Pizza* said, protects "negative rights to be free from government action" but does "not create positive rights—requirements that the government act."  154 F.3d at 319 (internal quotation marks omitted).  As the unions read this language, it explains why there was no First Amendment burden in *Ysursa*, *Pizza*, or *Bailey*, where the government was a regulator and employer, and why there *is* a burden here where the government has erected a "negative" obstacle to the unions' ability to raise political funds.  But this slice of *Pizza* does not tell the whole story.  The opinion still says that unions do not have an independent constitutional right to "compel their employer to assist them in exercising their First Amendment rights." *Id.* at 320. Absent a burden on a constitutionally cognizable right, the government may regulate what is at best a speech-facilitating mechanism.

Our circuit does not stand alone in reaching this conclusion. The Seventh Circuit also refused to limit these free-speech principles to the public employment context. At issue in *Sweeney v. Pence* was the validity of Indiana's Right to Work Act, which prevented private employers from imposing mandatory dues or union membership on their employees. 767 F.3d 654 (7th Cir. 2014). Relying on *Ysursa*, the court held that the law did not infringe the unions' First Amendment rights merely because it made it more difficult for them to collect funds. *Id.* at 669. The court's assessment of the claim applies with equal force here: The State's "decision not to subsidize the exercise of a fundamental right" did not itself infringe that right. *Id.*

For these reasons, we affirm in part and reverse in part.